BANKERS TRUST COMPANY, Plaintiff,

v.

Walter FELDESMAN, Daniel Rhoades, Herman Soifer, Milton Braten, Brookfield Clothes, Inc., Brookfield Industries, Inc., Bennington Court Ltd., Braxton Ltd., Aura By Laurie, Ltd., Erwin Commercial Corp., Michael B. Marks, Inc., Timely Textiles, Inc., Todd Equipment Leasing Co., Inc., Capital Aid Corporation and "John Does Nos. 1–50," Defendants.

No. 82 Civ. 5590 (WCC).

United States District Court,
S.D. New York.

June 29, 1983.

Moses & Singer, New York City, for plaintiff; David B. Eizenman, David Rabinowitz, Ira Schreck, New York City, of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for defendant Herman Soifer; Joel W. Sternman, Grace Goodman, New York City, of counsel.

Bernstein & Obstfeld, P.C., New York City, for defendants Daniel Rhoades, Milton Braten, Brookfield Industries, Inc., Bennington Court, Ltd., Braxton Ltd., Aura By Laurie, Ltd., Erwin Commercial Corp., Michael B. Marks, Inc., Timely Textiles, Inc., Todd Equipment Leasing Co., Inc. and Capital Aid Corp.

## OPINION AND ORDER

CONNER, District Judge.

Perhaps enticed by the lure of a treble damage recovery, private litigants have attempted increasingly to utilize the civil remedies [1] of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., in a variety of factual settings ostensibly within the broadly-worded provisions of the statute but arguably far beyond the original contemplation of the framers of the legislation. The instant action presents yet another example of that trend. Plaintiff Bankers Trust Company ("Bankers") seeks to invoke the RICO remedies to recover treble damages plus attorney's fees for injuries suffered substantially as a consequence of defendants' alleged bankruptcy frauds. The case is currently before the Court on the motions of defendant Herman Soifer ("Soifer") and defendants Daniel Rhoades ("Rhoades"), Milton Braten ("Braten"), Brookfield Industries, Inc. ("Brookfield Industries"), Bennington Court, Ltd. ("Bennington Court"), Braxton Ltd. ("Braxton"), Aura By Laurie, Ltd. ("Aura"), Erwin Commercial Corp. ("Erwin"), Michael B. Marks, Inc. ("Marks"), Timely Textiles, Inc. ("Timely Textiles"), Todd Equipment Leasing Co., Inc. ("Todd") and Capital Aid Corporation ("Capital") for judgment on the pleadings dismissing the complaint.[2] Rule 12(c), F.R.Civ.P. All defendants contend that the complaint is insufficient to state a civil claim under RICO, while Soifer further argues that the claims against him are barred by the statute of limitations or, if not, may only be asserted

1. 18 U.S.C. § 1964.

2. The claims against the one other defendant in this action, Walter Feldesman, were dismissed

in pending bankruptcy proceedings. For the reasons stated below, the motions to dismiss the complaint are granted.

*Facts*

For purposes of this motion, plaintiff's version of the events will be accepted as true. See 2A J. Moore, Moore's Federal Practice ¶ 12.15 at 2343 (2d ed. 1983). The genesis of this action lies in a $4,000,000 debt allegedly owed to Bankers by the Braten Apparel Corporation ("BAC"). In August 1974, at a time when it had recently sustained severe financial losses and owed substantial debts to Bankers and others, BAC acquired all the stock of Brookfield Clothes Inc. ("Brookfield Clothes"), which at that time had a net worth of more than $3,000,000. Complaint ¶ 11. Feldesman, Braten and Soifer allegedly made a secret agreement to conceal this acquisition for the purpose of obtaining a favorable discharge of BAC's debts by pursuing Chapter XI proceedings in the bankruptcy court. Complaint ¶ 13.

To effectuate this plan, Braten and Soifer executed a sham "Shareholder's Agreement," drafted by Feldesman, which purported to require Braten or BAC to furnish a $250,000 loan to Brookfield Clothes by a specified date or else the Brookfield Clothes stock owned by BAC would be transferred to Soifer. At the time they entered into that agreement, Braten and Soifer knew that the condition would not be met, but instead intended that Soifer would hold the Brookfield Clothes stock in a secret trust during the pendency of BAC's Chapter XI proceedings. Complaint ¶¶ 15–17. On September 5, 1974, BAC filed a petition for relief under Chapter XI of the now repealed 1898 Bankruptcy Act. The petition omitted BAC's ownership of the Brookfield stock, which was transferred to Soifer that same day. Complaint ¶ 18. Through a series of omissions and misrepresentations, conveying the erroneous impression that BAC had no ownership interest in Brook-

pursuant to a Stipulation endorsed by this Court on March 4, 1983.

field Clothes, Feldesman, Soifer, Braten and Rhoades, counsel to Braten and BAC in the Chapter XI proceeding, induced BAC's creditors, including Bankers, to approve an arrangement under which Bankers would receive 17½% of its claims. Complaint ¶¶ 18–21. The approval of that arrangement by the bankruptcy court on March 12, 1976 had the effect of relieving BAC of more than $4,300,000 in debts. Complaint ¶ 22. Had BAC's ownership of Brookfield Clothes been revealed, however, a liquidation of BAC would have provided funds sufficient to satisfy in full the debt owed to Bankers. Complaint ¶ 24.

Beginning in August 1976, the individual defendants began to consummate the secret trust through a complicated sequence of stock transfers. First, Soifer acquired from Braten 50% of the stock of Brookfield Industries, to which a substantial portion of the assets of Brookfield Clothes was conveyed. Feldesman then delivered the stock of Brookfield Clothes to Soifer who in turn delivered the stock to Rhoades on behalf of Braten and BAC. Then, in October 1976, Soifer purchased 45% of the stock of BAC from Braten. As part payment for that purchase, Soifer delivered to Braten a $450,000 note in July 1977. That note was subsequently assigned by Braten to Rhoades. Complaint ¶¶ 25–27.

Upon learning of the alleged fraud, Bankers in September 1976 commenced a proceeding in this Court to revoke the approval of the bankruptcy arrangement. While that revocation action was pending, Rhoades and Braten instituted a series of lawsuits in New York against Bankers in order to hinder and delay Bankers' collection of the debt owed to it. The complaint in each of those actions alleged that Bankers had breached a commitment to extend additional credit to BAC and sought millions of dollars in damages. All of those suits were, however, summarily dismissed. Complaint ¶ 29.

In August 1977, BAC commenced suit in South Carolina against Bankers seeking $195,000,000 in damages on the basis of allegations similar to those previously advanced in the New York lawsuits. BAC was represented in that matter by a South Carolina law firm to which Rhoades was of counsel. In a contemporaneous action, Braten, represented by the same South Carolina law firm, asserted claims superior to Bankers' claims to funds in an escrow account derived from the sale of machinery in which Bankers had a security interest. Both of these cases were presided over by Judge William H. Ballenger. Complaint ¶¶ 30–31.

At the end of 1978, Rhoades, through a South Carolina corporation formed by him, assumed a mortgage debt on which Judge Ballenger was personally liable to the extent of $100,000. Because of that undertaking, Judge Ballenger was induced to render decisions in the two South Carolina cases favorable to BAC and Braten, including the appointment of a special referee in the escrow action having business ties to Rhoades and the denial of Bankers' motion to dismiss the damage action. Complaint ¶¶ 32–33. This prejudice to Bankers' rights continued until Judge Ballenger recused himself from the escrow action and until his decision denying Bankers' motion to dismiss the damage action was reversed by the South Carolina Supreme Court as an abuse of discretion. By that time, however, Bankers had incurred attorney's fees in excess of $100,000. Complaint ¶ 34.

In January 1982, Bennington Court obtained advances of more than $8,900,000 from KB Business Credit Inc. ("KBBC") by means of wire transfers of funds, which were then disbursed to the bank accounts of several of the corporate defendants. When these defendants failed to repay the funds so obtained, KBBC instituted a RICO action in this Court seeking to recover treble the amount of its damages. Complaint ¶¶ 36–38.

On February 1, 1982, trial of Bankers' application to revoke the bankruptcy arrangement was completed. While the parties were awaiting the Court's decision in that matter, BAC, in April 1982, conveyed its stock in Brookfield Clothes to Todd for little or no consideration. Complaint ¶ 39.

Thereafter, BAC caused Todd to pledge its Brookfield Clothes stock to KBBC in order to induce KBBC to discontinue its lawsuit and thereby relieve the individual defendants of possible personal liability for the advances which had not been repaid to KBBC. Despite this pledge, Todd was not a defendant in the action brought by KBBC. Complaint ¶ 40. Moreover, in addition to the Brookfield Clothes stock transfer, BAC secreted and conveyed without consideration other of its assets during the pendency of the revocation proceeding as a further impediment to satisfaction of the claims of Bankers and other creditors. Complaint ¶ 41. Finally, on June 25, 1982, the Bankruptcy Court for this District revoked the Chapter XI plan, finding, *inter alia,* that confirmation of the plan had been procured by fraud. See *In re Braten Apparel Corp.,* 21 B.R. 239 at 258 (Bkrtcy.S.D.N.Y.1982) (Babitt, J.), *aff'd,* 26 B.R. 1009 (S.D.N.Y. 1983).

*Discussion*

RICO's civil damage remedy provides that:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964. Section 1962(a) makes it unlawful for any person to invest any income derived from "a pattern of racketeering activity" in the acquisition, establishment or operation of any "enterprise" engaged in interstate commerce.[3] Section 1962(b) prohibits any person from acquiring or maintaining an interest in or control of such an enterprise "through a pattern of racketeering activity,"[4] while section 1962(c) makes it illegal for anyone employed by or associated with the enterprise to participate "in the conduct of [its] affairs through a pattern of racketeering activity."[5] It is also unlawful for any person to conspire to violate any of these provisions. 18 U.S.C. § 1962(d).

A "pattern of racketeering activity" includes any two acts of "racketeering activity" within a ten-year period. See 18 U.S.C. § 1961(6). The predicate acts constituting "racketeering activity" encompass virtually every state law felony as well as many federal crimes, including bribery, mail fraud, securities fraud and bankruptcy fraud.[6]

3. 18 U.S.C. § 1962(a) provides in full that:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity of the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

4. 18 U.S.C. § 1962(b) provides in full that:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

5. 18 U.S.C. § 1962(c) provides in full that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

6. Section 1961(1) provides:

"Racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or

Bankers argues that its claim falls squarely within RICO's broadly-worded provisions. Indeed, based solely upon the language of the statute, one can hardly contend that plaintiff has not adequately alleged a violation of § 1962, a criminal statute. But the existence of a civil RICO remedy for a particular plaintiff does not necessarily follow directly from proper allegations of a criminal violation by the defendants. Section 1964 requires that one suing for damages be injured "by reason of a violation of Section 1962." Moreover, defendants contend that for a private litigant to have a valid cause of action under § 1964 he must adequately allege that the defendants are members of, or have ties to, organized crime. While I reject the proposition that a defendant's connection with organized crime is an independent and essential element of a claim under § 1964, the complaint in the instant case still fails because Bankers has not been damaged "by reason of" a RICO violation.

## A. *Organized Crime Connection*

The legislative history of RICO leaves no doubt that Congress intended the statute to combat the growing influence of organized crime in the United States, with specific focus on organized crime's infiltration of legitimate businesses. See 116 Cong.Rec. 953 (1970) (remarks of Senator Thurmond) ("these provisions are new and unique approaches to combat organized crime"); *id.* at 35295 (remarks of Congressman Poff) ("provides the machinery whereby the infiltration of racketeers into legitimate businesses can be stopped"); *id.* at 35300 (remarks of Congressman Mayne) ("major focus and principal objective of S. 30 is to provide new weapons capable of striking at the heart of this criminal hierarchy and its source of revenue"); *id.* at 36926 (remarks of Senator Dole) ("designed to curtail—and eventually eradicate—the vast expansion of organized crime's economic power"); see *also United States v. Turkette,* 452 U.S. 576, 588–89, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981). Despite the clear goal of the legislation, RICO's draftsmen expressly rejected the idea of including a definition of organized crime in the bill as a means to accomplish that purpose. They aptly recognized that the concept of organized crime is not susceptible of the type of precise definition that could serve as a basis for consistent judicial application.[7] Moreover, even if the requisite organized criminal nexus could be

dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472 and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions, section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (c) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States.

7. See 116 Cong.Rec. 35204 (1970) (remarks of Congressman Poff) ("is no organized crime definition ... in part, because it is probably impossible precisely and definitively to define organized crime"). *But cf. Moss v. Morgan Stanley,* 553 F.Supp. 1347, 1359–60 (S.D.N.Y.1983) (Pollack, J.).

adequately defined, the draftsmen were concerned that they would be creating a status offense that could not survive constitutional scrutiny. See 116 Cong.Rec. 35204 (1970) (remarks of Congressman Poff).

These concerns have not been lost on the courts, most of which have refused to hold that a private plaintiff must allege the defendant's connection with organized crime as an independent element of a RICO cause of action for damages. See, *e.g., Schact v. Brown,* 711 F.2d 1343 [Current] Fed.Sec. L.Rep. ¶ 99,160 at 95,604–07 (7th Cir. 1983) (citing cases); *Bennett v. Berg,* 685 F.2d 1053, 1063 (8th Cir.1982); *Richardson v. Shearson/American Express Co., Inc.,* [Current] Fed.Sec.L.Rep. ¶ 99,145 at 95,525 (S.D.N.Y. Mar. 29, 1983); *Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391, 396 (S.D.N.Y.1982); *Harper v. New Japan Securities Int'l, Inc.,* 545 F.Supp. 1002, 1006 n. 9 (C.D.Ca.1982). *But see Minpeco v. Conticommodity Services Inc.,* 558 F.Supp. 1348 at 1351 (S.D.N.Y. 1983); *Waterman Steamship Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256, 260 (E.D.La.1981); *Adair v. Hunt Int'l Resources Corp.,* 526 F.Supp. 736, 747 (N.D.Ill. 1981). Relying heavily on Judge Pollack's recent decision in *Moss v. Morgan Stanley Inc.,* 553 F.Supp. 1347 (S.D.N.Y.1983), defendants argue that this Court should reject both these precedents and the legislative history and require Bankers to allege that they have a connection with organized crime.

It is true that in *Moss,* Judge Pollack stated that:

RICO was thus established as a civil weapon against those engaged in organized crime who have gained an unfair competitive or financial advantage through criminal means associated with racketeering. The statutory offenses created by RICO were aimed at the evils of criminal racketeering by organized crime that had spread through the economy.

\*      \*      \*      \*      \*      \*

In civil litigation there is every reason why the application of RICO should be restricted sharply to organized crime and the enterprises on which its talons have fastened. Thus, courts in the Southern District and elsewhere have held that RICO claims for damages could be maintained only if there was a tie to organized crime. (citations omitted).

553 F.Supp. at 1361.

However, that statement was unnecessary to the decision in that case because, as Judge Pollack found, the defendant Morgan Stanley was "not principally charged with any substantive act that could constitute even a single act of racketeering." 553 F.Supp. at 1361–62. Although this Court wholeheartedly concurs in Judge Pollack's views respecting the ultimate objectives of Congress, this Court cannot agree with his views as to the means which Congress provided for accomplishing those ends. In any event, this Court believes it unnecessary in this case to expound a legal principle requiring, as an element of a civil RICO claim, establishment of defendants' connection with an identifiable unit of organized crime.

### B.  *RICO Injury*

■ However, this does mean that RICO's private remedy has unlimited reach, but only that, instead of adding to the cause of action another element of dubious propriety and uncertain breadth, the proper way to restrict the private remedy to its intended scope is by applying the limitations Congress has itself built into the statute. See also *Moss, supra,* 553 F.Supp. at 1360. One such restriction is the requirement that a private plaintiff allege that he has suffered a distinct RICO injury as opposed merely to a direct injury from the underlying predicate acts. The words of § 1964 expressly require that a private plaintiff be injured "by reason of a violation of section 1962" in order to maintain an action for damages. Unless these words have no effect, they can only mean that the plaintiff's injuries must derive from the "pattern of racketeering activity" which violates § 1962 rather than

directly from the underlying acts which combine to constitute that pattern.[8]

■ Although it is not necessary for the Court precisely to define the components of a RICO or "racketeering enterprise" injury, see *Landmark Savings & Loan v. Loeb Rhoades Hornblower & Co.,* 527 F.Supp. 206, 209 (E.D.Mich.1981), in order to resolve the instant motion, it seems appropriate to limit the extraordinary private remedy of § 1964 to the class of plaintiffs who have suffered a competitive injury by reason of the defendant's racketeering activities. See *North Barrington Development, Inc. v. Fanslow,* 547 F.Supp. 207, 211 (N.D.Ill. 1980); cf. *Harper v. New Japan Securities Int'l, Inc.,* 545 F.Supp. at 1007–08. The legislative history reveals that RICO's civil remedy was modeled after the relief available in the antitrust area. See, e.g., 116 Cong.Rec. 35295 (remarks of Congressman Poff) ("private persons injured by reason of a violation of the title may recover treble damages in Federal courts—another example of the antitrust remedy being adapted for use against organized criminality"); *Harper, supra,* 545 F.Supp. at 1004–05. The analogy to the antitrust laws is reinforced by the language of § 1964(c), which is virtually identical to that of § 4 of the Clayton Act, 15 U.S.C. § 15, and gives standing only to one "injured in his business or property." In the statement of findings and purposes which accompanied RICO, Congress expressed its concern that "organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, [and] seriously burden interstate and foreign commerce." Pub.L. 91–454 at § 1. This suggests an injury to competition, which is clearly lacking in the present case.

It is impossible for this Court to believe that in enacting RICO Congress intended to sweep all ordinary injuries occasioned by the predicate criminal acts within the dragnet of the treble damage remedy provided by § 1964. In almost all cases, a person injured directly by a predicate crime will have a cause of action for damages under either federal or state law. See *Landmark, supra,* 527 F.Supp. at 209. For example, it would seem illogical that a plaintiff suing under the federal securities laws could recover only one-third of the damages recoverable by a person suing under RICO for the identical injury.[9] See *Harper, supra,* 545 F.Supp. at 1007–08. Certainly this Court would not attribute to Congress an intention to make this fundamental change in the nature of private damage remedies absent some clear indication that such a drastic result was envisioned.

■ There is no evidence, however, that RICO was designed to retool private remedies in this manner. It was simply not intended to provide a plaintiff with a windfall recovery for ordinary injuries which are otherwise compensable. See also *Johnsen v. Rogers,* 551 F.Supp. 281, 285 (C.D.Ca. 1982). In *Moss,* Judge Pollack expressed a similar view, which afforded ample grounds for his dismissal of the civil RICO claim against Morgan Stanley, apart from the failure to allege an organized crime connection:

> In other words, plaintiff's injury to be cognizable under RICO must be caused by a RICO violation and not simply by the commission of a predicate offense, such as mail fraud or federal securities fraud. RICO's civil remedy provision permits a recovery to "any person injured in his business or property *by reason of a violation of Section 1962,*" 18 U.S.C. Section 1964(c) (emphasis supplied), that is,

---

**8.** Section 1962 creates its own substantive offenses, violations of which carry harsh criminal penalties that are independent of and go far beyond any punishments for the predicate acts themselves. See *United States v. Ivic,* 700 F.2d 51, 60 (2d Cir.1983).

**9.** To bring himself within the ambit of RICO, a plaintiff must, of course, allege that the defend-

ants have committed at least two of the underlying crimes set forth in § 1961(1). However, in view of the broad range of predicate acts covered by that section, including mail fraud, it is a simple task to allege a pattern of racketeering activity in virtually every securities or bankruptcy fraud case.

where the distinctive RICO violation contributed to plaintiff's injury.

\* \* \* \* \* \*

Moreover, there is nothing in the legislative history to suggest that Congress intended to create a private right of action for treble damages for violations of substantive statutes by ordinary business or parties. For example, it was clearly established at the time that RICO was enacted that there was no private right of action for violations of the mail fraud statute. It is implausible that Congress could have meant to alter this accepted rule to the extent of creating a right of action for treble damages without a single mention of such a revolutionary consequence anywhere in the legislative history. 553 F.Supp. at 1361.

The injuries suffered by Bankers were a direct consequence of the predicate acts and thus are not under any definition of a RICO injury within the ambit of § 1964(c). The facts alleged by Bankers strongly suggest a sinister scheme to defraud the bank and other creditors of the monies they lent in good faith to BAC. But however reprehensible defendants' actions were, the harm they have allegedly caused Bankers was directly caused by an ordinary, albeit complex, bankruptcy fraud. If the injuries to Bankers in this case are sufficient to satisfy the requirements of § 1964, then virtually every bankruptcy fraud could serve as the basis for a treble damage action under RICO. Nor can defendants' participation in the alleged bribery in South Carolina serve to promote Bankers' fraud claim into a treble damage action. The bribe was merely one facet of defendants' plan to impede Bankers' collection efforts through a complicated scheme of phony transfers and baseless court actions. Bankers' injuries were a direct result of these acts and not a consequence of any independent pattern of racketeering activity. Bankers' RICO allegations add nothing to the substance of its claims.

10. In view of this conclusion, the Court finds it unnecessary to consider any of the additional points raised by Soifer.

Accordingly, for the reasons stated above, the motions for judgment on the pleadings dismissing the complaint for failure to state a claim are granted.[10] The complaint is dismissed as to all defendants.

SO ORDERED.