BANKERS TRUST COMPANY,
Plaintiff–Appellant,

v.

Daniel RHOADES, Herman Soifer and
Milton Braten, Defendants–Appellees.

No. 1074, Docket 88–7054.

United States Court of Appeals,
Second Circuit.

Argued April 28, 1988.

Decided Oct. 3, 1988.

David Rabinowitz, New York City (David B. Picker, Moses & Singer, New York City, of counsel), for plaintiff-appellant.

Joel W. Sternman, New York City (Steven Alexander, Rosenman & Colin, New York City, of counsel), for defendant-appellee Herman Soifer.

Thomas Lagrotta, Brewster, N.Y. (Daniel Rhoades, Rhoades & Rhoades, Brewster, N.Y., of counsel), for defendants-appellees Daniel Rhoades and Milton Braten.

Before CARDAMONE, PRATT, and MAHONEY, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

This case is now on its second trip through the federal appellate system. On the first appeal, Bankers Trust Company ("Bankers") avoided dismissal when our split decision, holding that Bankers had

failed to state a claim under 18 U.S.C. §§ 1964(c) and 1962 because it had not suffered "a distinct RICO injury" from defendants' alleged RICO violation, was vacated by the Supreme Court. *Bankers Trust Co. v. Rhoades*, 741 F.2d 511 (2d Cir.1984), *vacated*, 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985).

This time the issues are different, but they still focus upon whether Bankers can press its civil RICO action against these defendants. First, does Bankers lack standing to bring a civil RICO action against the officers of a bankrupt corporation for injuries sustained as a result of the officers' fraudulent depletion of corporate assets? Second, is Bankers' action barred by the statute of limitations?

The district court decided both questions against Bankers and dismissed the action pursuant to Fed.R.Civ.P. 12(b)(6). We disagree with the district court and hold that (1) Bankers has standing to bring a civil RICO action against these defendants, and (2) that Bankers' action, at least in part, is not barred by the statute of limitations, but (3) that the portion of Bankers' claim seeking to recover for its lost debt is premature and therefore must be dismissed without prejudice. Accordingly, we reverse and remand.

## I. BACKGROUND

In reviewing this motion to dismiss under Fed.R.Civ.P. 12(b)(6), we must accept the allegations of plaintiff's complaint as true. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964).

Daniel Rhoades, Herman Soifer, and Milton Braten own, direct, and control Braten Apparel Corporation ("BAC"), a New York corporation grossing over $50 million per year through the import, manufacture, and sale of apparel. As with most businesses of this size, BAC has multiple creditors, the largest being Bankers—a banking company incorporated and headquartered in New York City—to which BAC currently owes over $4 million.

In August 1974, due to severe financial losses and in an effort to avoid BAC's liabilities to Bankers and other creditors, Braten and Soifer agreed to seek a reduction of the corporation's debts through a Chapter 11 bankruptcy proceeding. In so doing, they agreed to fraudulently conceal from BAC's creditors a major asset: Brookfield Clothes, Inc. ("Brookfield"), a recently acquired corporation specializing in the sale of apparel, with net assets in excess of $3 million.

To carry out this scheme, Braten and Soifer executed a sham document which they later claimed was a valid shareholders' agreement. The document required BAC or Braten to lend Brookfield $250,000 by a specified date, in default of which BAC's ownership of Brookfield would be transferred to Soifer. Soifer and Braten never intended that the loan be made, but expected that the bankruptcy court and BAC's creditors, upon being shown the sham document and being informed that the condition had not been met, would believe that BAC no longer had any ownership interest in Brookfield. Braten and Soifer agreed that Soifer would hold Brookfield in a secret trust during the pendency of BAC's Chapter 11 proceedings, and would return it only after BAC had achieved a substantial reduction in its debts through a confirmed reorganization plan.

After completing this fraudulent transfer, BAC filed a petition in bankruptcy on September 5, 1974. Rhoades acted as attorney for BAC and, along with Braten and Soifer, misrepresented to the court, to Bankers, and to other creditors that, because BAC had failed to issue the loan as required under the shareholders' agreement, it no longer had any ownership interest in Brookfield.

Relying on these misrepresentations, Bankers agreed to, and the bankruptcy court confirmed, a plan of arrangement for BAC under which Bankers agreed to receive only 17.5% of its allowed claim. This plan relieved BAC of more than $4.3 million in debts, and permitted it to continue operating with Rhoades, Braten, and Soifer retaining control. Critical to Bankers' ac-

ceptance of the plan was its belief that *all* BAC assets were being made available to the Chapter 11 proceeding. Had it known of the fraudulent transfer of Brookfield, Bankers never would have consented to the reorganization plan.

Shortly after confirmation of the plan and termination of the bankruptcy proceedings, Soifer, through a complicated series of transactions, returned ownership and control of Brookfield to BAC. At that time, Brookfield anticipated sales of $18 million in the coming year, had an annual net income in excess of $1.4 million, and had assets valued at well over $10 million.

In a further attempt to delay Bankers from collecting its debt, Rhoades, Braten and Soifer initiated frivolous lawsuits against Bankers in both New York and South Carolina state courts. In connection with the South Carolina action, in late 1978 Rhoades acquired, through a South Carolina corporation which he formed and which Soifer and Braten owned, a mortgage on which the judge presiding over the South Carolina action was personally obligated. Through an illegal agreement with the South Carolina judge, defendants then paid the judge's debt as the mortgage installments came due. In return, the judge rendered two decisions favorable to BAC: on November 9, 1978, he denied Bankers' motion to dismiss the action; and on January 18, 1979, he appointed a special referee who had ties to BAC and its counsel. These two bribed decisions caused Bankers to expend over $100,000 in legal fees.

In September 1976, upon learning of the transfer of Brookfield back to BAC, Bankers moved in the bankruptcy court to revoke BAC's confirmation plan, alleging that it had been procured by fraud. The record is unclear as to why the bankruptcy court did not act on this motion immediately; but whatever the reason, in 1981–82, over five years after Bankers moved to revoke but while that motion was still pending, Rhoades, Braten and Soifer, in a continuing attempt to prevent Bankers and other creditors from collecting their debts, conspired to and did in fact fraudulently conceal and deplete BAC assets through a wide variety of methods, including fraudulent stock transfers, transfers of corporate assets to other companies and individuals without fair consideration, and transfers of monies in corporate accounts to satisfy defendants' personal debts. Finally, on June 30, 1982, the bankruptcy court, holding that BAC had obtained its Chapter 11 reorganization by fraudulent means, revoked its confirmation plan and reinstated the bankruptcy proceedings. Those proceedings are still pending in the bankruptcy court.

Bankers commenced this action against defendants in the district court on August 24, 1982. It alleged that the continuing actions of Rhoades, Braten and Soifer—the common-law fraud and bankruptcy fraud in 1974–76, the frivolous lawsuits and bribery of the South Carolina judge in 1978–79, and the fraudulent conveyances in 1981–82—constituted a "pattern of racketeering activity" in violation of 18 U.S.C. § 1962(a)–(d).

In his first decision in 1983, Judge Conner found that plaintiff's complaint alleged a violation of 18 U.S.C. § 1962, and that "the injuries suffered by Bankers were a direct consequence of the predicate acts." *Bankers Trust Co. v. Feldesman*, 566 F.Supp. 1235, 1242 (S.D.N.Y.1983). Nevertheless, he dismissed the complaint because Bankers did not suffer a "competitive" injury. *Id.* at 1240–42. A divided panel of this court affirmed, *Bankers Trust Co. v. Rhoades*, 741 F.2d 511 (2d Cir.1983), but the Supreme Court subsequently vacated the judgment, *see Bankers Trust Co. v. Rhoades*, 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985), in light of its decision in *Sedima v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

On remand, the district court received further briefing on two issues raised in defendants' initial motion to dismiss but not addressed in the court's first decision: standing and statute of limitations. Thereafter, on September 3, 1986, the district court issued an order (1) upholding the complaint as to Rhoades and Braten; (2) dismissing the claims of substantive RICO violations against Soifer as time-barred;

but (3) upholding the claim that Soifer conspired with the other defendants to violate RICO. On the standing issue, the district court specifically held that Bankers had asserted "injuries * * * in its own right", not merely injuries to BAC which might be recoverable only by a bankruptcy trustee. *Bankers Trust Co. v. Feldesman*, 648 F.Supp. 17 (S.D.N.Y.1986).

Defendants moved to reargue, and on December 22, 1987, the district court reversed itself in part and dismissed Bankers' complaint as to all defendants. Specifically, the district court held that Bankers lacked standing to pursue a civil RICO action based on defendants' common-law fraud, perjury and bankruptcy fraud—all alleged to be part of defendants' attempt to deplete BAC assets—because Bankers had suffered no injury from these illegal acts. Rather, the court stated, only BAC, as the corporation whose assets were fraudulently transferred, was injured by defendants' actions. In addition, applying a three-year statute of limitations, the district court held the bribery claims time-barred because the last injury to Bankers occurred on January 18, 1979, over three years before it commenced its RICO action in federal court. *Bankers Trust Co. v. Feldesman*, 676 F.Supp. 496 (S.D.N.Y.1987).

This appeal followed.

## II. DISCUSSION

Bankers' argument on appeal is two-fold. First, it argues that it has standing to pursue a civil RICO claim directly against the individual defendants, and that the district court's holding to the contrary was error. Second, Bankers contends that the district court erred in dismissing on statute of limitations grounds. We agree with both contentions.

### A. *Bankers' Standing to Bring a RICO Claim.*

Determining that formulation of an acceptable plan of reorganization "would be all but impossible if a creditor could employ RICO to recover misappropriated assets from the bankrupt's corporate officers" during the pendency of the bankruptcy proceedings, the district court held that Bankers had no standing "to sue for any injury attributable to the depletion of BAC's corporate assets." Such analysis correctly perceives a legitimate problem—if Bankers is allowed to bring its RICO claim (and collect treble damages plus costs and attorney's fees), there may well be nothing left for the bankrupt's estate to recover—but it uses the wrong mechanism to ensure that problem's solution.

The civil RICO statute, 18 U.S.C. § 1964(c) provides that *"[a]ny person* injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor * * * and shall recover threefold the damages he sustains * * *."* (emphasis added). This language contains no special limitation on standing; all that is required is that plaintiff suffer injury in fact, *see Sedima v. Imrex Co.*, 473 U.S. 479, 495, 105 S.Ct. 3275, 3284, 87 L.Ed. 2d 346 (1985) (the only standing requirement under § 1964(c) is that the plaintiff be "injured in his business or property by the conduct constituting the violation"), and that the injury be caused by defendants' RICO violation. Thus, as another panel of this court recently recognized: "A defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, but only to anyone whose injuries were caused by reason of a violation of section 1962." *Sperber v. Boesky*, 849 F.2d 60, 64 (2d Cir.1988) (citation omitted). Significantly, this injury is not limited to damages suffered from the RICO violation as a whole, but also includes injuries suffered from each predicate act. Those acts are, when committed in the circumstances delineated in § 1962, "an activity which RICO was designed to deter", and recoverable damages "will flow from the commission of the[se] predicate acts." *Sedima*, 473 U.S. at 497, 105 S.Ct. at 3285.

With these principles in mind, along with congress's instructions that we broadly construe the statute, *see* Pub.L. 91–452, Title IX, Section 904, 84 Stat. 941, we hold that the district court erred when it applied

an additional, special requirement of standing to Bankers' civil RICO claim. Put simply, if Bankers was injured by defendants' acts, as its complaint adequately alleges in this case, *see* 741 F.2d at 515–16, it has standing to bring a RICO claim, regardless of the fact that a bankrupt BAC might also have suffered an identical injury for which it has a similar right of recovery.

This conclusion is not contrary to our decision in *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986), where we held that the shareholder of an injured corporation did not have individual standing to bring a claim under civil RICO. In so holding, we merely recognized a standing requirement applicable throughout corporate law: "An 'action to redress injuries to a corporation cannot be maintained by a shareholder in his own name but must be brought in the name of the corporation'" through a derivative action. *Id.* at 849 (*quoting Warren v. Manufacturers National Bank*, 759 F.2d 542, 544 (6th Cir.1985)).

In this case, Bankers does not seek recovery for injuries suffered by BAC, but for injuries it suffered directly. Defendants' conduct—bribery, perjury, fraud, and bankruptcy fraud—caused Bankers monetary damage, and the right to recover for that injury belongs, not to BAC or its bankrupt estate, but to Bankers. *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1042 (2d Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986) (where plaintiff corporation alleged that it suffered damages from the fraud of a director of a bankrupt corporation, plaintiff has a right to recover separate from any claim the bankrupt corporation may have).

█ It is true, as defendants argue and the district court recognized, that there is an overlap of RICO and bankruptcy law in this case. *Bankers Trust Co. v. Feldesman*, 676 F.Supp. 496, 503 (S.D.N.Y.1987) ("Equitable distribution, the fundamental principle of bankruptcy, would be all but impossible if a creditor could employ RICO to recover misappropriated assets from the bankrupt's corporate officers during the pendency of a Chapter 11 reorganization."). Such an overlap occurs not only because Bankers was injured by the identical transactions that injured the bankrupt corporation, but also because to the extent that the corporation, through its trustee in bankruptcy, is able to recover for its injury, Bankers' injury will be correspondingly reduced.

This overlap, however, does not present a question of Bankers' standing to bring a civil RICO claim, but rather presents the question of which and how much in damages Bankers can recover under that RICO claim, an issue we discuss in depth later in this opinion. *See infra, Part B, subsection 2(b)*. As far as standing is concerned, there is no doubt, taking Bankers' allegations as true, that defendants violated § 1962 and that Bankers suffered injury from that violation. This is all that is necessary in order to bring an action under § 1964(c). *Sedima*, 473 U.S. at 495, 105 S.Ct. at 3284.

### B. *Statute of Limitations.*

█ To begin with, the district court erred in applying a three-year limitations period to this civil RICO action. Six months before the district court issued its decision, the Supreme Court, perceiving a need for uniformity and following the model of the Clayton Act, *see* 15 U.S.C. § 15b (Supp.1988), decreed that a four-year period should apply to all civil RICO actions regardless of the predicate acts involved. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, — U.S. —, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987).

Correcting this error does not end our inquiry as to whether the judgment of the district court must be reversed, however, because there is another, far more difficult part to the limitations problem: when did Bankers' civil RICO action accrue? Did it accrue when defendants depleted BAC assets in 1972–74? When Bankers learned of those depletions in 1976? Or in 1978–79 when defendants again attempted to prohibit Bankers from collecting ·its rightful debt? Or in 1981–82 when defendants took further steps to deplete corporate assets?

Or perhaps the action is yet to accrue as Bankers suffers new injuries from defendants' past or future RICO violations growing out of the same pattern of racketeering?

### 1. *Accrual of a civil RICO action.*

■ Because the earliest date the cause of action could have accrued in *Malley–Duff* was well within the four-year period adopted by the Court, the Supreme Court expressly left undecided the question of when a civil RICO action accrues. *Malley–Duff,* —— U.S. at ——, 107 S.Ct. at 2767. Over the past few years, our district courts have wrestled with this accrual issue, but have reached varied, sometimes conflicting, results. *See, e.g., Long Island Lighting Co. v. Imo Delaval, Inc.,* 668 F.Supp. 237, 239–40 (S.D.N.Y.1987) (explicitly rejecting plaintiff's theory that a civil RICO action does not accrue until commission of the last predicate act upon which the claim is founded, court holds that a claim "accrues when the plaintiff knows or should know of the injury that is the basis for the action"); *Cantor v. Life Alert, Inc.,* 655 F.Supp. 673 (S.D.N.Y.1987) ("statute of limitations begins to run after commission of the first overt act causing damage"); *State of New York v. O'Hara,* 652 F.Supp. 1049, 1056 (W.D.N.Y.1987) (civil RICO action for each injury accrues on the date each injury occurred); *Cahill v. Arthur Andersen & Co.,* 659 F.Supp. 1115, 1126 (S.D.N.Y.1986) (action accrues at time of last alleged predicate act), *aff'd on other grounds,* 822 F.2d 14 (2d Cir.1987) (per curiam); *Bankers Trust Co. v. Feldesman,* 648 F.Supp. 17, 36 (S.D.N.Y.1986) (applying the "continuing violation doctrine" to civil RICO claims). Recognizing this confusion, we today decide the question and hold that each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury.

We find support for this holding in two major sources. First and most important, the plain language of the statute requires it. Under § 1962, a person commits a RICO violation when he (a) invests income derived from a "pattern of racketeering" in an "enterprise"; or (b) controls an "enterprise" through a "pattern of racketeering activity"; or (c) participates in an "enterprise" through a "pattern of racketeering activity"; or (d) conspires to violate subsection (a), (b) or (c). 18 U.S.C. § 1962(a)–(d) (1984). In other words, a violation of § 1962 occurs when a person, through a "pattern of racketeering activity", acts to invest in, participate in, or control an "enterprise". Criminal liability for any of these violations is subject to a five-year statute of limitations which runs—where a substantive violation is alleged pursuant to subsection (a), (b) or (c)—from the time of the last predicate act of racketeering activity by the defendant, or—where a conspiracy violation is alleged pursuant to subsection (d)—from the time the objectives of the conspiracy have been accomplished or abandoned. *United States v. Persico,* 832 F.2d 705, 713–14 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1996, 100 L.Ed.2d 227 (1988).

An action to recover civil damages for these same criminal violations, while closely related, is nevertheless subject to an additional requirement. Section 1964(c) provides that only a "person injured in his business or property by reason of a violation of section 1962" may bring a civil RICO action. Thus, a civil plaintiff must prove not only that the acts of defendant constitute a RICO violation, but also that plaintiff suffered injury as a result of that violation. *See Sperber v. Boesky,* 849 F.2d 60, 64 (2d Cir.1988) (defendant liable only for injury "caused by reason of a violation of section 1962"); *Haroco, Inc. v. American National Bank and Trust Co.,* 747 F.2d 384 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam). Until such injury occurs, there is no right to sue for damages under § 1964(c), and until there is a right to sue under § 1964(c), a civil RICO action cannot be held to have accrued. *See Sedima v. Imrex Co.,* 473 U.S. at 496, 105 S.Ct. at 3285 (plaintiff "can only recover to the extent that * * * he has been *injured* in his business or property by the conduct

constituting the violation") (emphasis added).

Even after injury has occurred, however, and a civil RICO claim has accrued, there will frequently be additional, independent injuries that will result from the same violation of § 1962, but which, because they will not occur until some point in the future, are not yet actionable as injuries to plaintiff's business or property. 18 U.S.C. § 1964(c) (1984). Multiple injuries, spread over time, frequently result from the very nature of a RICO violation. As we have recognized before, congress enacted RICO to deal with a broadly based, deeply rooted problem by establishing new prohibitions, enhanced sanctions, and new remedies to deal with the activities of those engaged in illegal practices. *Durante Bros. & Sons, Inc. v. Flushing National Bank,* 755 F.2d 239, 248 (2d Cir.), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985) (citing Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922 (Statement of Findings and Purpose)). Rather than simply providing a new avenue of redress for wrongs cognizable at common law or prohibited by statute, congress's main goal was to eradicate organized crime. *Cullen v. Margiotta,* 811 F.2d 698, 718 (2d Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). To reach this goal, RICO takes a unique approach; it looks for a "pattern" of illegal acts—each of which, standing alone, may injure a plaintiff—and then views them together as a single violation. As a result, there may be encompassed within a single RICO violation injuries, both multiple and independent, that occur over a broad span of time. *See generally Sedima,* 473 U.S. at 496 & n. 14, 105 S.Ct. at 3285 & n. 14.

■ With these multiple injuries in mind, congress tied the right to sue for damages under § 1964(c), not to the time of the defendant's RICO violation, but to the time when plaintiff suffers injury to "his business or property" from the violation. Consequently, a plaintiff's action accrues against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury. *See Cullen v. Margiotta,* 811 F.2d 698, 725 (2d Cir.) ("[u]nder federal principles, a claim accrues when the plaintiff 'knows or has reason to know' of the injury that is the basis of the action") (citation omitted), *cert. denied,* — U.S. —, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). At a later date, when a new and independent injury is incurred from the same violation, the plaintiff is again "injured in his business or property" and his right to sue for damages from that injury accrues at the time he discovered or should have discovered that injury. The logical end result is that a plaintiff may sue for any injury he discovers or should have discovered within four years of the commencement of his suit, regardless when the RICO violation causing such injury occurred. *See State Farm Mutual Automobile Insurance Co. v. Ammann,* 828 F.2d 4, 5 (9th Cir.1987) ("as to each injury civil RICO limitations period 'begins to run when the plaintiff knows or has reason to know of the injury which is the basis of the action'") (citation omitted).

■ We hasten to add that although a cause of action for a new and independent injury does not accrue until the plaintiff actually suffers that injury, this does not mean that a plaintiff can never recover future damages on a civil RICO claim. On the contrary, where the plaintiff has already suffered injury and will continue to suffer that *same* injury in the future, an award of past and future damages may be entirely appropriate, subject of course to the normal standards governing such awards. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 295 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Only in instances where the plaintiff has suffered no injury, or where the injury is unprovable, is an award of future damages inappropriate. *See* 18 U.S.C. § 1964(c) (1984); *Zenith,* 401 U.S. at 339, 91 S.Ct. at 806.

As a second major source of support to the rule of separate accrual that we apply

today, we look to the Clayton Act, 15 U.S.C. § 15 *et seq.* (Supp.1988). In holding that the Clayton Act's four-year statute of limitations was "the most appropriate limitations period for [civil] RICO actions", the Supreme Court explicitly recognized that "the civil action provision of RICO was patterned after the Clayton Act." *Malley–Duff,* —— U.S. at ——, 107 S.Ct. at 2764, 2767. Indeed, "[t]he 'clearest current' in the legislative history of RICO 'is the reliance on the Clayton Act model.'" *Id.* at ——, 107 S.Ct. at 2764 (*quoting Sedima,* 473 U.S. at 489, 105 S.Ct. at 3281). Noting the statutes' similarities, the Court found that both RICO and the Clayton Act "are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees"; that both statutes "bring to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate"; that "the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages"; and that both statutes "aim to compensate the same type of injury" by requiring "that a plaintiff show injury 'in his business or property by reason of' a violation". *Id.* at ——, 107 S.Ct. at 2764.

In light of these similarities, we have little trouble in concluding that the same statute which lends its four-year limitation period to civil RICO actions should also lend its rule of accrual in determining when the four-year period begins to run. Generally, a cause of action under the Clayton Act accrues and the statute of limitations begins to run, when a defendant commits an antitrust violation that injures a plaintiff's business. *Zenith,* 401 U.S. at 338, 91 S.Ct. at 806; *Berkey Photo,* 603 F.2d at 295. An action for the injury must be brought within four years, plus any additional period during which the statute of limitations may be tolled. *Zenith,* 401 U.S. at 338, 91 S.Ct. at 806.

In the context of a continuing antitrust violation with continuing injuries, this has usually been understood to mean that each time plaintiff suffers an injury caused by an illegal act of defendants, a cause of action accrues to plaintiff to recover damages based on that injury. *Zenith,* 401 U.S. at 338, 91 S.Ct. at 806; *Crummer Co. v. Du Pont,* 223 F.2d 238, 247–48 (5th Cir.), *cert. denied,* 350 U.S. 848, 76 S.Ct. 85, 100 L.Ed. 755 (1955). "Each separate cause of action that so accrues entitles a plaintiff to recover not only those damages which he has suffered at the date of accrual, but also those which he will suffer in the future from the particular invasion, including what he has suffered during and will predictably suffer after trial." *Zenith,* 401 U.S. at 338–39, 91 S.Ct. at 806. Thus, if a plaintiff discovers or should have discovered injury from an antitrust violation on a specific date, "a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future * * *." *Id.* To recover those damages, he must sue within four years of the time the action accrued.

Of course, future damages arising from defendants' conduct are "unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." *Id.; see also Berkey Photo,* 603 F.2d at 295; *Ansul Co. v. Uniroyal, Inc.,* 448 F.2d 872, 884 (2d Cir.1971), *cert. denied,* 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972). In such cases, "refusal to award future damages as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered. The cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted." *Zenith,* 401 U.S. at 339, 91 S.Ct. at 806. These Clayton Act principles of accrual apply equally to civil RICO actions.

We realize that in adopting a "rule of separate accrual" *State Farm,* 828 F.2d at 5 (Kennedy, C.J., concurring), we are rejecting the general federal rule of accrual, which requires in cases involving continuing violation and continuous injury that the statute of limitations begin running upon the commission of the first overt act caus-

ing damage, and does not permit a subsequent injury to start the limitations period running anew. *See Lowell Wiper Supply Co. v. Helen Shop, Inc.*, 235 F.Supp. 640, 644 (S.D.N.Y.1964) (collecting cases). Such a rejection is mandated by the continuing violations and injuries sought to be remedied under RICO and the Clayton Act. "Otherwise, future damages that could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery, contrary to the congressional purpose that private actions serve 'as a bulwark of * * * enforcement,' and that the * * * laws fully 'protect the victims of the forbidden practices as well as the public.'" *Zenith*, 401 U.S. at 340, 91 S.Ct. at 807 (citations omitted).

In sum, we today hold that civil RICO actions are subject to a rule of separate accrual. Under this rule, each time plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises as to that injury, regardless of when the actual violation occurred. A plaintiff, under *Malley-Duff*, must then bring his action within four years of this accrual to recover damages for the specific injury. Naturally, as with all rules of accrual, the standard tolling exceptions apply. *See, e.g., Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) (class action tolling); *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir.1988) (fraudulent concealment); *Cullen v. Margiotta*, 811 F.2d 698, 721–24 (2d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987) (class action and duress).

> 2. *Application to this case of the statute of limitations under the rule of separate accrual.*

Having determined generally that plaintiff may recover for any injury caused by defendants' RICO violation if plaintiff discovered or should have discovered that injury within four years of the commencement of this action, we now apply this standard to Bankers' specific injury claims.

Bankers commenced its action on August 24, 1982; hence, it may recover for any injury it discovered or should have discovered on or after August 24, 1978. In its third amended complaint, Bankers alleges multiple injuries which may be grouped into three general categories: (a) past legal fees and other expenses, (b) loss of a legitimate debt and related expenses, and (c) future legal fees and expenses. We shall discuss each in turn.

■ a. *Past legal fees and other expenses.* Several injuries claimed by Bankers fall within this category: (1) an unspecified amount in legal fees and other expenses incurred in fighting defendants' frivolous lawsuits in New York state court; (2) $100,000 in legal fees and other expenses spent in overcoming bribe-induced decisions in a similar lawsuit in South Carolina; and (3) $100,000 in legal fees and other expenses incurred in obtaining a revocation of the initial reorganization plan.

Under our rule of separate accrual, Bankers may recover any of these expenses which it discovered or should have discovered on or after August 24, 1978. We therefore instruct the district court that it may dismiss from this action any claim for legal fees and other expenses which Bankers discovered or should have discovered before that date. In so instructing, we note our agreement with Judge Conner when he held that Bankers suffered injury as to each expense when it became obligated to pay that expense, and not at some later date when it actually made the payment. *Bankers Trust Co. v. Feldesman*, 676 F.Supp. 496, 504 (S.D.N.Y. 1987) ("If Bankers was able to postpone accrual of its claim until it had paid its legal expenses, then Bankers could keep its claim open indefinitely simply by protracting the litigation.").

■ b. *Loss of a legitimate debt and related expenses.* In this second category, Bankers claims (1) loss of a legitimate debt in 1976 when, relying on defendants' misrepresentations, it accepted a bankruptcy reorganization plan that would have allowed Bankers to recover only 17.5% of its allowed claim; (2) loss of the use of those

funds from that time to present; and (3) an additional loss in funds which might have been used to pay the debt in 1981–82, but were instead fraudulently transferred by the defendants.

Normally of course, we would simply instruct the district court to determine what portion of these injuries Bankers discovered or should have discovered after August 24, 1978, and order that Bankers could not recover on any injury which it discovered or should have discovered before that date. However, in this case, we hold that Bankers' damages in this category are "unrecoverable", at least at this time, because "their accrual is speculative" and "their amount and nature unprovable". *Zenith*, 401 U.S. at 339, 91 S.Ct. at 806; *Berkey Photo*, 603 F.2d at 295.

As discussed previously, Bankers' RICO claim for injuries suffered as a result of its lost debt overlaps with the ongoing proceedings in the bankruptcy court. This is because (1) Bankers was injured by the identical transactions that injured the bankrupt corporation, and (2) should the corporation, through its trustee in bankruptcy, recover for its injury, Bankers' injury will itself be reduced. For instance, should the bankruptcy trustee ultimately recover all the fraudulently transferred assets, Bankers' injury could be significantly reduced; conversely should the assets never be recovered, or should the bankruptcy court order the claim abandoned, Bankers' injury would be much more severe.

Trebling and attorney's fees aside, congress intended the basic award under civil RICO to compensate the plaintiff for injury to "his property or business." 18 U.S.C. § 1964(c) (1984). As in other areas of the law, this compensation takes the form of awarding damages sufficient to place the plaintiff in the same financial position he would have occupied absent the illegal conduct. *Illinois C.R. Co. v. Crail*, 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699 (1930); *United States Steel Products Co. v. Adams*, 275 U.S. 388, 48 S.Ct. 162, 72 L.Ed. 320 (1928).

Yet, at this time, it is impossible to determine the amount of damages that would be necessary to make plaintiff whole, because it is not known whether some or all of the fraudulently transferred funds will be recovered by the corporation. Should they be recovered, Bankers would benefit along with BAC's other creditors and its injury would decrease. As a result, the damages in this area are "speculative" and "unprovable", *Zenith*, 401 U.S. at 339, 91 S.Ct. at 806; any claim for relief based on the lost-debt injury must therefore be dismissed without prejudice.

As we stated previously, refusal to award damages as too speculative is equivalent to holding that no cause of action has yet accrued. *Zenith*, 401 U.S. at 339, 91 S.Ct. at 806. When the damages do become definite, a claim will accrue, and plaintiff will have four years to bring an action for recovery. *Id.* Consequently, after the claims that Bankers has in common with BAC are dealt with by the bankruptcy court—through recovery of all or part of BAC's assets, an order of abandonment, or some other final disposition of the lost-debt claims—Bankers' injury will be ascertainable, an action as to the injury will accrue, and Bankers will then have four years to bring a civil RICO action to recover the damages it has suffered in this area, subject of course to the normal rules and procedures governing such claims.

■ c. *Future injury.* Bankers' complaint also alleges that it will continue to suffer future injury as it spends additional funds to trace lost assets and incurs ongoing legal fees and other expenses in the bankruptcy proceeding. As to these future expenses, however, Bankers has not yet suffered injury, and its claim therefor is yet to accrue. The trial court may, of course, permit supplementation of the complaint to allow for damages of this type suffered up to the time of trial. *Borger v. Yamaha International Corp.*, 625 F.2d 390, 398 (2d Cir.1980); *Shayne v. Madison Square Garden Corp.*, 491 F.2d 397, 401 (2d Cir.1974). To recover future fees and expenses beyond that time, Bankers must wait until it suffers the injury.

In sum as to the statute of limitations issues, we reverse the district court and

remand with the instruction that it reinstate Bankers' substantive and conspiracy claims against all defendants, but limit any recovery to damages for injuries which Bankers discovered or should have discovered on or after August 24, 1978. In addition, the district court shall dismiss any claim by Bankers to recover damages based on its unrecovered debt without prejudice to refiling after the bankruptcy court has finally disposed of the corporation's claim based on the same underlying transactions.

### C. *Other Arguments.*

■ Three other arguments merit brief mention here. First, Bankers argues that because BAC is still controlled by defendants Bankers should be allowed to bring its RICO claims to recover for its lost debt in spite of the ongoing bankruptcy proceedings. That this argument carries some weight cannot be contested—after all, it is unlikely that Rhoades, Soifer and Braten would initiate an action for breach of fiduciary duty against themselves—but Bankers presents this argument in the wrong forum. It is the bankruptcy court, in the first instance, that has power to appoint a trustee, to order the claim abandoned by the trustee so that Bankers may proceed, or to grant some other relief from the automatic stay. Any argument and decision on this point should thus take place, in the first instance, in the bankruptcy court.

Second, Bankers contends that at most, its claims, which were dismissed by the district court, should only have been stayed. *See* 11 U.S.C. § 362(a)(3) (Supp. 1988). We need not reach this argument, however, because, as discussed above, Bankers' claims that arise after the beginning of the four-year limitations period fall into two groups: those that have accrued and those that have not. As to the former, the claims are reinstated. As to those that have not yet accrued, there is no action yet pending and therefore nothing to be stayed.

■ Finally, we reject Soifer's contention that the complaint does not sufficiently allege his participation in the 1978–79 or 1981–82 acts of the other defendants. At this early stage and in the absence of any meaningful discovery, Bankers has been unable to ascertain fully the extent of Soifer's participation in and knowledge of the bribery and 1982 frauds. Nevertheless, more than enough has been pled to raise an inference of Soifer's knowledge and participation.

The South Carolina corporation that Rhoades formed to assume the bribed judge's mortgage debt was beneficially co-owned by Soifer, and the moneys used to pay the bribe came from this corporation and from BAC (of which Soifer was not only a co-owner, but also an officer). BAC's assets were deliberately stripped away at a time when Soifer was its president, with some of these assets being transferred to other entities co-owned by Soifer, and over $4 million in cash being paid to or on behalf of Soifer personally to enable a partnership of which he was a member to acquire real estate. In addition, at a time when revocation of BAC's bankruptcy reorganization was imminent, BAC's stock in Brookfield was transferred to another corporation beneficially co-owned by Soifer. These allegations are sufficient both under Fed.R.Civ.P. 12(b)(6) and 9(b). *See Bale v. Dean Witter Reynolds, Inc.,* 627 F.Supp. 650, 652 (D.Minn. 1986); *Kravetz v. Brukenfeld,* 591 F.Supp. 1383, 1388 n. 9 (S.D.N.Y.1984); *Green v. Hamilton International Corp.,* 437 F.Supp. 723, 729 (S.D.N.Y.1977).

### III. CONCLUSION

The judgment of the district court is reversed and the case is remanded.