**J. Reid BINGHAM, as Ancillary Administrator of the Estate of Robert Nesta Marley, Plaintiff–Appellee,**

v.

**Marvin ZOLT; Zolt & Loomis, P.C., and David J. Steinberg, Defendants–Appellants,**

**Greenstein, Gorelick, Price, Silverman & Laveson, Defendant,**

**Bluestein, Rutstein & Mirarchi, P.C.; Martin Oliner; Martin Oliner, P.C. and Coudert Brothers, Defendants–Third–Party–Plaintiffs,**

**Rita Marley and Mutual Security Merchant Bank and Trust Company, Third–Party–Defendants.**

**Nos. 621, 622, Docket 93–7695, 93–7709.**

United States Court of Appeals, Second Circuit.

Argued Dec. 12, 1994.

Decided Sept. 28, 1995.

Ray Beckerman, New York City (Gallet Dreyer & Berkey, New York City, of counsel), for appellants Marvin Zolt and Zolt & Loomis, P.C.

Jeremy D. Mishkin, Philadelphia, PA (Howard J. Bashman, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, of counsel), for appellant David J. Steinberg.

Robert W. Brundige, Jr., New York City (Jeffrey R. Coleman, Cheryl B. Schreiber,

Seth D. Rothman, Hughes Hubbard & Reed, New York City, of counsel), for appellee.

Before: NEWMAN, Chief Judge, OAKES and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

Defendants Marvin Zolt, Zolt and Loomis, P.C. (collectively Zolt), and David Steinberg appeal from an amended judgment entered July 21, 1993 in the United States District Court for the Southern District of New York (Conboy, J.) that, after a jury trial, found defendants liable in damages to the estate of Robert Nesta (Bob) Marley for fraud, breach of fiduciary duty, and violations of civil RICO under 18 U.S.C. § 1962(b), (c), and (d) (1988). Bob Marley was the Jamaican singer-songwriter responsible for bringing the reggae sound to the world and, to his fans, still is reggae music. Even today, 15 years after his death from brain cancer, he continues to be the world's best-selling reggae artist. He used his music as a vehicle to spread global messages of peace, brotherhood, African unity, and international morality. For his contributions to ending political violence in Jamaica, he was awarded in 1978 the United Nations Medal of Peace. It is particularly revealing of the perversity of human nature that such a person's estate be plundered by the perfidy of his closest advisors. It is that duplicity that gave rise to the litigation before us on this appeal.

## FACTS

### A. *Background*

Robert Nesta (Bob) Marley died intestate on March 11, 1981 survived by his wife Rita and 11 children. Under Jamaican intestacy law his wife was entitled to 10 percent of his estate outright and held a life interest in another 45 percent of it. Marley's 11 children were entitled to equal shares of the remaining 45 percent outright, plus a remainder interest in Rita's 45 percent life estate.

For five years from the time of Marley's death in 1981 until 1986, defendants David Steinberg, Marley's attorney, and Marvin Zolt, Marley's accountant, with the aid of his wife, Rita Marley, developed and implemented numerous schemes that allegedly diverted

foreign music assets and royalty income from Marley's estate to themselves. Defendants argued that their activities in creating new corporations and transferring funds from the estate to a chain of international companies were aimed at minimizing the estate's tax liabilities, leaving more to be distributed to Marley's beneficiaries.

### B. *The Principal Schemes*

Of the numerous schemes by which defendants diverted estate assets and income, only the four principal ones will be outlined.

1. *Share Transfer Scheme.* Before Bob Marley died he, individually, and his three wholly-owned British Virgin Islands companies (BVI Companies), received royalty payments and income from various recording and publishing contracts. The BVI Companies as personal assets of Marley would have become estate property upon his death, resulting in the estate's receipt of all of the royalty income due him. But defendants advised Rita Marley to forge her husband's signature on three documents transferring the ownership of the BVI Companies from Bob Marley to herself. The documents were pre-dated to 1978 to make it appear that Marley had made these transfers during his lifetime, thereby excluding them from estate property. Steinberg signed the documents as a witness.

Ownership of the BVI Companies was then transferred to a Netherlands Antilles company known as Music Publishing Companies of Bob Marley, N.V. (the NV or Netherlands Antilles Company), whose sole shareholder was Rita Marley. Later the BVI Companies were liquidated, their royalty-producing assets transferred to the NV Company and then, in turn, to a wholly-owned Dutch subsidiary, Bob Marley Music B.V. (the BV or Dutch Company). The result was that various amounts of royalty and other income rightfully belonging to the BVI Companies— and indirectly to the estate—were funnelled between bank accounts in the names of Steinberg, the NV Company, and the BV Company and subsequently transferred into Rita Marley's personal account or into special escrow accounts set up in Zolt's name.

2. *The Almo Scheme.* This scheme is set forth in a letter dated December 29, 1981. It involved a signed agreement between Zolt, Steinberg, and Rita Marley not to report to the estate Bob Marley's personal share of royalty checks received from Almo Music, a music administration company for Bob Marley's song publishing activities. These royalty payments totalled about $1 million for the two years from the date of Marley's death until 1983.

3. *The Island Assignment Scheme.* Under this plan Rita Marley forged her late husband's signature on an assignment, again signed by Steinberg as a witness. The document, backdated to August 13, 1980, assigned Bob Marley's individual rights under contracts with Island Records to one of the BVI Companies, causing the royalties produced under those contracts to be transferred to the bank accounts of the NV Company and BV Company mentioned above, rather than to the estate.

4. *The Rondor Scheme.* This scheme was accomplished by assigning the assets of Tuff–Gong Productions Ltd. (Tuff–Gong Delaware), a company individually owned by Bob Marley that would have been estate property, to one of the BVI Companies. The assignment was dated as of November 30, 1980 but actually made after Bob Marley's death. It stated that the assets were transferred for the alleged consideration of $100,000, although the copyrights at issue generated millions in royalties from 1980 to 1985.

### C. *The Concealment*

On December 17, 1981 letters of administration for Marley's estate were issued to co-trustees Rita Marley, Mutual Security Merchant Bank & Trust Company, a Jamaican bank, and George Desnoes, a prominent Jamaican attorney. Mutual Security, acting through George Louis Byles, its managing director, had primary responsibility for administering the estate. At a meeting to examine the estate's assets and liabilities, Steinberg told Byles that a large portion of Bob Marley's assets had been transferred to others before his death. At a later meeting on January 4, 1982 where Byles, Rita Marley, Steinberg, and Zolt were present, Stein-

berg specifically indicated that the BVI Companies were not part of the estate because they had been transferred to Rita Marley before Bob Marley's death.

On June 14, 1982 Byles called another meeting in Jamaica, attended by Zolt, Steinberg, Desnoes, and Rita Marley. When Byles again inquired about the ownership of the BVI Companies, Steinberg gave him copies of the forged share transfers, dated June 6, 1978, showing that Bob Marley transferred his shares in the companies to Rita Marley before his death. Steinberg and Zolt also represented to Byles that the assets of Tuff–Gong Delaware barely exceeded that company's liabilities.

Defendants further led Byles to believe that Bob Marley had assigned his contract rights with Island Records to one of the BVI Companies. In accounting to the estate over the next six years, defendants reported only minimal amounts of royalty proceeds, failing to remit to the estate millions of dollars they had received and transferred to bank accounts of the NV Company, the BV Company, Rita Marley, Steinberg, and Zolt.

### D. *The Suit*

On December 10, 1986 Mutual Security, in its capacity as administrator of the estate, filed the instant case against Zolt, Steinberg, and their affiliated firms. Rita Marley was not named as a defendant, although there is an action by the estate pending against her in Jamaica and she was subsequently named as a third-party defendant in the instant case. In March of 1987 J. Reid Bingham, having been appointed ancillary administrator of the estate in New York, was substituted as the plaintiff in the instant litigation. Additional defendants were named, including several other law firms from which Steinberg had leased offices, a tax lawyer Steinberg and Zolt had hired, and the firm where the tax lawyer practiced law (collectively "other law firms"). The suit alleged violations under the Racketeer Influenced and Corrupt Organizations Act (RICO), specifically 18 U.S.C. § 1962, and causes of action for conversion, fraud, breach of fiduciary duty, negligence, and gross negligence for improperly diverting the estate's assets.

A jury trial began on August 5, 1992 and lasted 12 weeks. With respect to damages, the estate submitted an accounting report stating that between 1981 and 1986, $13.4 million had been diverted from the estate. This amount was comprised of $2.9 million in bank accounts existing at the date of Marley's death and $10.5 million in royalties received after his death. After crediting defendants for funds diverted and subsequently recovered by the estate and for payments acknowledged to be legitimate, the estate sought $9.7 million in compensatory damages plus $1 million in consequential damages incurred in accounting costs.

The jury was given a 72–question special verdict sheet. Steinberg and Zolt were found liable for three RICO counts under 18 U.S.C. § 1962(b), (c), and (d), breach of their fiduciary duty, common law fraud, conversion, negligence, and gross negligence. The jury found the other law firm defendants not liable for any of the estate's damages. In addition, the jury was asked to determine when the estate actually knew of defendants' alleged wrongful acts. It found the estate had actual knowledge of the wrongful acts before December 10, 1982, more than four years before suit was brought. However, based upon the jury's findings that all of the RICO damages occurred after December 31, 1982, the district court concluded that the estate's RICO claims were not time-barred. *See Bingham v. Zolt,* 823 F.Supp. 1126, 1130 (S.D.N.Y.1993).

On January 8, 1993 the district court entered judgment based on the jury's verdict for the estate and against Steinberg and Zolt for $2,861,409.79 in compensatory damages, and, in addition, for $1,000,000 against Steinberg in punitive damages. Compensatory damages consisted of $800,000 in RICO damages, trebled to $2,400,000 pursuant to 18 U.S.C. § 1964(c), $250,000 in damages pursuant to the estate's common law claims, and prejudgment interest on the common law claims in the amount of $211,409.79. The common law awards were left standing even though the district court dismissed the negligence, gross negligence, and conversion claims as time-barred. Plaintiff was also awarded, pursuant to RICO, its reasonable

attorney's fees. Steinberg and Zolt were jointly and severally liable, but for purposes of contribution the jury found that Steinberg was liable for 75 percent and Zolt for 25 percent of this award.

In response to defendants' post-trial motions, the district court determined that the punitive damages award was erroneous to the extent it was based on the RICO claims. As a result, the trial court reduced it to $250,000. *See Bingham*, 823 F.Supp. at 1135. On July 21, 1993 an amended judgment was therefore entered awarding the estate $2,861,409.79 in damages against defendants consisting of the trebled RICO award, common law damages and prejudgment interest upon the common law award, $3,029,428.46 in attorney's fees and disbursements, and $250,000 in punitive damages against Steinberg. From this judgment, Steinberg and Zolt appeal. For the reasons discussed below, we affirm.

## DISCUSSION

On appeal defendants Steinberg and Zolt attack the judgment, charging that the estate's civil RICO claims were time-barred, the estate lacked standing, the jury's verdict was inconsistent, the damages awards were improper, and attorney's fees were improperly awarded under RICO. Several additional issues are raised. All will be addressed in order.

### I RICO Claims Not Time–Barred

Analysis turns first to the statute of limitations. As detailed above, defendants were found liable for funnelling millions of dollars in royalty payments out of the estate through various schemes. Companies and contract rights were fraudulently transferred out of the estate in order to facilitate the diversion of many royalty checks into defendants' bank accounts. The jury found the estate had actual knowledge of defendants' wrongful acts more than four years prior to suit, but that it had suffered $1,050,000 in injuries—of which $800,000 were allocated as RICO injuries—*after* December 31, 1982. The district court ruled that the estate's previous knowledge of the underlying wrongful acts did not bar its action as to these RICO injuries

under the "separate accrual" rule of *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir.1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1643, 104 L.Ed.2d 158 (1989).

No specific limitations period is provided in the RICO statute. The Supreme Court announced a uniform four-year limitations period for civil RICO actions, but expressly declined to decide the question of when such civil RICO actions accrue. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 156–57, 107 S.Ct. 2759, 2766–67, 97 L.Ed.2d 121 (1987). The result has been a split among the circuits generating as many as half a dozen conflicting accrual rules. *See generally* Mary S. Humes, Note, *RICO and a Uniform Rule of Accrual*, 99 Yale L.J. 1399 (1990); Paul B. O'Neill, Note, *"Mother of Mercy, Is This the Beginning of RICO?":* *The Proper Point of Accrual of a Private Civil RICO Action*, 65 N.Y.U. L.Rev. 172 (1990); *see also In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 850 F.Supp. 1105, 1116–17 and 1117 n. 8 (S.D.N.Y.1993) (summarizing the conflict). A civil RICO action has been held to accrue upon, *inter alia*, the commission of the last predicate act, *see, e.g., County of Cook v. Berger*, 648 F.Supp. 433 (N.D.Ill.1986), plaintiff's discovery of the last predicate act, *see, e.g., Keystone Ins. Co. v. Houghton*, 863 F.2d 1125 (3d Cir.1988), or plaintiff's discovery of his resulting injuries, *see, e.g., La Porte Constr. Co. v. Bayshore Nat'l Bank*, 805 F.2d 1254 (5th Cir.1986).

In this Circuit we recognize a "separate accrual" rule under which a new claim accrues, triggering a new four-year limitations period, each time plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations. *See Cruden v. Bank of New York*, 957 F.2d 961, 977 (2d Cir.1992); *Bankers Trust*, 859 F.2d at 1102; *accord State Farm Mut. Auto. Ins. Co. v. Ammann*, 828 F.2d 4, 5 (9th Cir.1987). In *Bankers Trust*, defendants, officers of a bankrupt corporation, fraudulently concealed assets of the bankruptcy estate through a complicated series of transactions, and instituted frivolous lawsuits against plaintiffs to prevent them from recovering a legitimate debt. *See* 859 F.2d at 1098–99. Plaintiffs

incurred various legal fees and expenses over time, besides the loss of the debt itself. (The loss of debt claim, although not time-barred, was dismissed without prejudice because its amount was speculative. *See id.* at 1105–06.) Noting that in enacting RICO, Congress had in mind the possibility of "multiple and independent [injuries] that occur over a broad span of time," we held that a rule permitting a new cause of action to accrue with each independent injury was "[t]he logical end result." *Id.* at 1103.

■ A necessary corollary of the separate accrual rule is that plaintiff may only recover for injuries discovered or discoverable within four years of the time suit is brought. *See id.* at 1104–05. As long as separate and independent injuries continue to flow from the underlying RICO violations—regardless of when those violations occurred—plaintiff may wait indefinitely to sue, but may then win compensation only for injuries discovered or discoverable within the four-year "window" before suit was filed, together, of course, with any provable future damages. *See Bankers Trust,* 859 F.2d at 1103.

■ In holding that the estate could recover from defendants for RICO injuries occurring after December 31, 1982, the district court correctly applied our separate accrual rule. Defendants point to one of our recent decisions, issued after trial was concluded in this case, which they believe indicates the district court was in error. *See Long Island Lighting Co. v. Imo Indus., Inc.,* 6 F.3d 876, 887 (2d Cir.1993) (*LILCO*). In *LILCO,* plaintiff purchased generators in 1973, received them in 1976 and 1977, but kept them in storage until 1981. When plaintiff began testing and installation the generator crankshafts failed, resulting in massive repair, replacement and financing costs. *See id.* at 879–81. We affirmed the *district court's* holding that because LILCO knew or should have known the crankshafts were defective no later than 1977, all of its civil RICO claims were time-barred when it brought suit in 1985. *See id.* at 887. Defendants assert that *LILCO* conclusively demonstrates the civil RICO limitations period is not automatically triggered each time new injuries flow from predicate wrongful acts.

Defendants misapprehend the import of *LILCO;* it is not a multiple-injury case in the sense of *Bankers Trust.* The financial losses suffered by LILCO after 1981 were not "new *and independent* injur[ies]," *Bankers Trust,* 859 F.2d at 1103 (emphasis added), that would cause the accrual of a new limitations period. LILCO's civil RICO cause of action accrued when it learned, or should have learned, that the generators were defective— that is, that it had incurred the actionable injuries of receiving defective generators in derogation of its contract and warranty rights. The additional financial losses that resulted from LILCO's decision to use the defective equipment were not independent from that original injury. *Accord Glessner v. Kenny,* 952 F.2d 702, 708 (3d Cir.1991) (under injury-discovery rule, costs of continuing to service and ultimately replacing defective oil furnace "could not be considered a 'further injury' sufficient to revive the RICO cause of action") (citing *Bankers Trust* ).

LILCO's post–1981 losses did not revive its civil RICO claim because non-independent injuries will not cause a new limitations period to accrue. Had LILCO brought timely suit in 1977, before the generators were installed, its recovery would have been limited to the cost of replacing the equipment, plus provable consequential damages, such as loss of business through delay. It could not have recovered all the expenses it actually incurred after 1981 for installation, repair, and damage caused by the breakdown of the defective crankshafts. By deciding to install, use, and repair the defective equipment, LILCO increased its losses attributable to the underlying injuries it suffered when the defendant delivered the defective generators. But those newly-incurred expenses were not sufficiently independent from the original injuries to start a new civil RICO limitations period running, nor would it make sense to give plaintiffs the power to restart the limitations clock in this way.

To reach the conclusion that plaintiff's later losses did not restart the civil RICO clock, *LILCO* reasoned that all the damage done to the plaintiff could be clearly ascertained at the time it knew or should have known it purchased defective goods:

"LILCO's injury was not in any sense speculative at that juncture, and its RICO claims accrued at that time." *LILCO*, 6 F.3d at 887. Thus, the injury to LILCO was complete before it installed and used the faulty generators—there was no subsequent new injury to trigger a new limitations period. The speculative-versus-determinable language corresponds in practice to the underlying notion that a new and independent injury must occur to give rise to a separately-accruing civil RICO action under the rule of *Bankers Trust.* It does not mean, as defendants suggest, that newly-incurred injuries *never* restart the RICO clock.

The speculativeness language of *LILCO* was taken from *Cruden*, 957 F.2d 961, a civil RICO accrual case occurring in a single-injury context. In *Cruden*, plaintiff debenture holders brought a civil RICO action against the issuer premised on fraud. Although the fraudulent acts alleged had occurred more than four years prior to suit, we held the RICO claim timely because it did not accrue until the debentures went into default—that is, until an injury occurred. *See id.* at 977–78. Plaintiffs had no cause of action before default, since up until that time the possibility of damages was " 'speculative [and] their amount and nature unprovable.' " *Id.* at 977 (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971)). Upon default, however, the full value of the debentures became due immediately and the cause of action accrued. What would have been a stream of future income absent default became a single injury upon default. *Cruden* thus addresses the accrual of a civil RICO action based on a single injury rather than several successive injuries. Although the speculativeness rule might be helpful in analyzing whether each of a series of injuries is sufficiently ripe for a RICO cause of action to accrue, that rule does not determine whether successive injuries are sufficiently independent to cause re-accrual.

We think the instant case is closer factually to *Bankers Trust* than to either *LILCO* or *Cruden*, as it involves a continuing series of fraudulent actions undertaken to divert and conceal assets and income. A variety of schemes were employed, involving frequent misappropriations of discrete amounts of money from different sources, such as various royalty payments owing to Marley's BVI Companies and payments from Almo Music. Defendants were found guilty of funnelling royalty checks out of the estate from the time of Marley's death to the commencement of this litigation, and each illegal diversion constituted a new and independent legally cognizable injury to the estate. As a consequence, with each diversion a new civil RICO cause of action accrued, with a corresponding four-year limitations period, and plaintiff's action is timely with respect to all diversions occurring within four years of suit. We hold therefore that the estate's RICO action against defendants was not barred by the statute of limitations.

We note parenthetically there are no future injuries at issue in this case: the companies and contract rights generating future income streams have been restored to the estate. Were there, under somewhat different facts, a prospect of continuing diversions, plaintiff would of course have been entitled to recover such future damages as were provable. *See Bankers Trust*, 859 F.2d at 1103. We need not decide, in the case at hand, whether a plaintiff would be prohibited from bringing a series of suits when future damages are provable in an earlier action, but plaintiff elects not to seek such damages until a later time.

## II The Estate's Standing

■ Defendants next contend the estate lacked standing to assert causes of action belonging to the diverted corporations. Their argument is based on the general principle that a shareholder cannot sue in his individual capacity to redress wrongs inflicted upon a corporation in which he holds stock. *See, e.g., Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 292, 130 L.Ed.2d 206 (1994); *Green v. Victor Talking Mach. Co.*, 24 F.2d 378, 380–81 (2d Cir.), *cert. denied,* 278 U.S. 602, 49 S.Ct. 9, 73 L.Ed. 530 (1928).

■ When the claim is that corporate property has been removed from the corporation, it is the corporation—having an inde-

pendent legal identity—that must seek, on its own or derivatively, to redress its injury. The shareholder in such a case is injured only as a result of the injury to another, *i.e.,* the corporation, and therefore generally lacks standing. On the other hand, where the individual owns property—cash, real estate, or shares of stock—and that property is stolen, the individual suffers an injury personal to him and no other. In such a case it is only the individual that may properly seek to redress his injury.

For the most part defendants' contention rests on a mischaracterization of the causes of action alleged. This mischaracterization is most clearly seen with respect to the "Almo Scheme" and the "Island Assignment Scheme." In each case the contract rights and royalty checks diverted had been the personal property of Bob Marley. This property would have then passed to the estate upon his death. Defendants' schemes shifted these rights from Bob Marley's estate to themselves. There is no doubt that the estate has standing to assert claims based on these schemes.

While seemingly more complex, the "Share Transfer Scheme" is conceptually identical to the two other schemes. Plaintiffs' claim is not so much that assets were stolen from the BVI Companies, but rather that the BVI Companies themselves were stolen from the estate. The BVI Companies were wholly-owned by Bob Marley and, again, would have become estate property upon his death. Defendants, by means of Rita Marley's forgery of Bob Marley's signature, transferred ownership of the BVI Companies out of the estate. Hence, it is the estate, and not the companies themselves, that has suffered an injury. The injury is complicated by defendants' subsequent liquidation of the BVI Companies, but this fact does not alter the underlying analysis that the estate was deprived of property—the BVI Companies—that it rightfully owned.

Defendants' characterization does hold true, however, for the so-called "Rondor Scheme." That scheme involved the transfer of assets from Bob Marley's wholly-owned Tuff–Gong Delaware to one of the BVI Companies. Thus, it was Tuff–Gong Delaware

that suffered an injury and not the estate. The estate's only injury is as the sole shareholder of that corporation. Nonetheless, to the extent plaintiffs' claims pertained to this scheme, it has standing to sue.

We have recognized an equitable exception in estate cases—disregarding the separate status of the estate-shareholder and the corporation "to prevent fraud or to achieve equity." *Musico v. Champion Credit Corp.,* 764 F.2d 102, 108–10 (2d Cir.1985) (internal quotes omitted). We have also permitted a shareholder to sue directly when the defendant owes a direct legal duty to the shareholder. *See Ceribelli v. Elghanayan,* 990 F.2d 62, 64 (2d Cir.1993). Zolt and Steinberg, Bob Marley's accountant and lawyer, owed fiduciary duties directly to him and his estate. Their actions in diverting estate assets and income breached that duty. Consequently, even in the schemes where the estate was injured only as a shareholder, defendants' breaches of their fiduciary duty as well as equitable considerations confer standing on plaintiff in this action.

### III No Need to Reconcile Jury Verdict

Zolt maintains, as a third challenge, that the district court erred in denying his counsel's request to submit two additional special verdict questions to the jury to clarify its allegedly inconsistent findings that the estate had actual knowledge of defendants' wrongful acts and that plaintiff justifiably relied on defendants' false representations. Counsel's two suggested questions were: (1) "State whether the estate had actual knowledge of the wrongful acts of defendant Marvin Zolt prior to December 10, 1982" and (2) "If the answer to the foregoing is 'yes,' state when the estate acquired actual knowledge of the wrongful acts of Marvin Zolt." Zolt reasons these questions were essential because if at all pertinent times the estate had actual knowledge of defendants' wrongdoing, plaintiff would not be able to satisfy the required element of justifiable reliance of defendants' representations to establish a claim for fraud.

■ Where there is an alleged inconsistency in a jury's verdict, the trial court is obliged to harmonize the dissonance, if such

is fairly possible. *See Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 891 (2d Cir.1988); *see also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962) ("where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way").

█ It is our task in reviewing the record to ascertain whether the trial court's reconciliation of the apparently inconsistent verdict is a reasonable reading of the record. *See Royal Cup, Inc. v. Jenkins Coffee Serv., Inc.*, 898 F.2d 1514, 1519 (11th Cir.1990). According to the jury's determination, the estate had actual knowledge of defendants' misconduct by December 10, 1982, four years before suit was filed. Hence, from that point forward no fraud claim could successfully lie because plaintiff would not be able to prove that it justifiably relied on defendants' false representations. However, from June 3, 1981, the latest date at which Mutual Security first became involved in the estate, until December 10, 1982 there is an 18–month window of opportunity when defendants may have committed fraud unknown to plaintiff. From the recitation of the facts we know that at least several meetings were held where defendants gave misleading and untruthful statements to bank officials regarding the status of the assets in Marley's estate. Thus, a cause of action based on fraud could lie because the estate may have relied justifiably upon defendants' misrepresentations during that 18–month period.

█ Further, the district court properly instructed the jury on the elements of plaintiffs' causes of action, including the fraud cause, against defendants. There is a strong presumption that the jury in reaching its verdict complied with those instructions. *See United States v. Casamento*, 887 F.2d 1141, 1151 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). A jury's verdict reached after proper instructions must be upheld where there is a reasonable explanation for the jury's seemingly inconsistent answers. In the case at bar, a plausible explanation of the jury's verdict existed—the fraud occurred prior to the estate's actual knowledge of defendants' wrongdoing. As a consequence, the district court's reconciliation was a fair explanation that eliminated the alleged inconsistency. It was not therefore an abuse of discretion for the court to refuse to submit counsel's proposed additional questions to the jury.

## IV Damages Awards

### A. Compensatory Damages Properly Determined

█ Steinberg maintains, as a fourth point, that the district court wrongly formulated the measure of damages suffered by the estate. He avers it was error to accept plaintiff's proposed measure of damages, *i.e.*, that it could recover as compensation all the money that went to the estate's "offshore" companies and bank accounts regardless of where the money eventually ended up. According to Steinberg, the estate suffered no loss because the funds from the estate's "offshore" companies and its bank accounts were distributed to estate beneficiaries who were entitled to receive them or were used to pay for the estate's legitimate expenses.

█ As "the measure of damages upon which the factual computation is based is a question of law," this question is subject to *de novo* review. *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir.1991) (internal quotes omitted). Defendant's argument is fundamentally flawed, to the extent that he incorrectly assumes that the beneficiaries of the estate are indistinguishable from the estate itself. An estate, of course, is an entity separate and distinct from its beneficiaries. *See In re Dolcater*, 106 F.2d 30, 31 (2d Cir.1939) (in suit to recover funds fraudulently extracted from an estate, any recovery will be for the benefit of the estate; such a suit may only be brought by the estate, unless beneficiaries prove executors of estate have refused to bring suit or that a request to do so would be futile). The district court followed this rule when it instructed the jury not to consider Rita Marley's entitlement, if any, as an estate beneficiary, noting that such matters were issues for the Jamaican probate court. We recognize that neither

Rita nor any other beneficiary can receive a double recovery—royalty payments paid from the unlawfully diverted song rights plus these same amounts as a component of compensatory damages paid to the estate for ultimate distribution to beneficiaries. But with the estate still in probate at the time of this damages action, it was not error to instruct the jury as the trial judge did. Once the amounts due the beneficiaries are ascertained in the probate proceeding, appropriate applications may be made to the Jamaican probate court or the trial court in this case to avoid a double recovery to the beneficiaries.

In addition, the trial court properly instructed the jury that the measure of damages could be reduced if the funds were used to pay legitimate estate obligations and plaintiff would at the time have authorized the payments to be made on its behalf. This instruction is analogous to the rule that states: "A tortfeasor cannot diminish the amount of recovery by paying a debt of the injured person without the latter's consent...." Restatement (Second) of Torts § 923 (1979); *see also D & G Equip. Co. v. First Nat'l Bank,* 764 F.2d 950, 959 (3d Cir.1985) ("A depositary or collecting bank, which seeks to establish a defense of mitigation by virtue of payment of the plaintiff's debts, must therefore offer proof that the converted monies were used to discharge the specific debts which the plaintiff would have elected to pay at the time the conversion occurred.").

Since a jury is presumed to comply with its instructions, *see Casamento,* 887 F.2d at 1151, the resulting verdict already accounted for any estate expenses paid by defendants that plaintiff would have authorized. Hence, the compensatory damages award was proper.

**B. *Post–Judgment Dismissal of Common Law Claims: Effect on Damages Award***

■ As part of its further questioning of the damages awards, Steinberg insists it was error to sustain any part of the jury's awards of compensatory and punitive damages that were based upon the estate's dismissed common law claims.

Defendant contends that when the district court set aside plaintiff's claims for conversion, negligence, and gross negligence as time-barred, it was required as a matter of law to vacate the jury's common law damages award of $250,000. He reasons the jury returned a lump sum award predicated upon all five of the estate's common law claims and it is impossible to determine which part of the jury's award, if any, is attributable to the dismissed claims and which part to the surviving claims. Thus, Steinberg concludes there is no way to know whether or not the invalid claim was the sole basis for the verdict. *See United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki,* 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959); *see also Morrissey v. National Maritime Union of Am.,* 544 F.2d 19, 26 (2d Cir.1976) ("The general rule is that when one of the two claims that have been submitted to the jury should not have been submitted, a general verdict ... cannot stand.").

■ This conclusion misses the mark. The jury did not return a general verdict, leaving the court uncertain as to liability on plaintiff's other claims. Rather, its special verdict found defendants liable on each common law claim. Plaintiff is entitled to recover its full measure of compensatory damages, despite the dismissal of certain common law claims, because each claim presented an alternative theory of liability based upon the same set of facts, the same series of acts, and the same injuries caused by the same actors. Whether or not a defendant is liable to a plaintiff under one or many theories of liability does not affect the damages award because the amount of compensatory damages awarded is not dependent on the number of theories that plaintiff alleges and under which it may recover. Rather, the amount of damages depends on the extent of the injury suffered. *See Clark v. Taylor,* 710 F.2d 4, 8 (1st Cir.1983).

**C. *Punitive Damages Award***

■ Steinberg asserts, in addition, it was error not to vacate the punitive damages award once the district court agreed that the RICO cause of action could not support puni-

tive damages. The district court reduced the punitive damages award from $1 million to $250,000 because the jury had been asked to consider an award of punitive damages on the RICO cause of action. Steinberg contends that they should have been dismissed altogether, since it was "impossible to discern on which claims the jury based its award of punitive damages." *Bingham*, 823 F.Supp. at 1135. He further states that the punitive damages award should have been dismissed since two of the common law claims on which punitive damages were potentially founded were dismissed as time-barred.

We have expressed the view that aggregate punitive damages awards are preferable, due to the risk that "separate awards for each component of misconduct might unduly increase the amount of the total award." *King v. Macri*, 993 F.2d 294, 299 (2d Cir. 1993). Faced with such an aggregate award, the district court lowered it significantly to an amount it considered reasonable and fair. Thus, our inquiry is limited simply to whether the award is so high "as to shock the judicial conscience and constitute a denial of justice." *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir.1988) (internal quotes omitted). In light of the facts and circumstances of this case, we think the award completely reasonable and therefore see no reason to direct a new trial on this issue.

## V Attorney's Fees Award Proper

Defendants challenge, as their fifth point, on several grounds plaintiff's award of $3,029,428.46 in attorney's fees and disbursements under RICO. Zolt tells us that attorney's fees under RICO as a matter of substantive law are subject to the parties' rights to discovery, an evidentiary hearing, and a jury trial. Steinberg believes the estate's request for fees was reduced an inadequate 15 percent based upon the unreasonableness of certain expenses. He thinks it should have been reduced much more substantially to reflect the estate's limited success at trial. This argument is based on the fact that the jury awarded only a small part of the damages sought by plaintiff, three of plaintiff's six charges were dismissed as time-barred,

and the estate prevailed against only three of eight defendants.

■ It was not error to reject Zolt's request for a jury trial, discovery, and an evidentiary hearing. It is the trial court, not the jury, that has the responsibility of determining attorney's fees awards pursuant to statute. *See Gagne v. Town of Enfield*, 734 F.2d 902, 904 (2d Cir.1984) (attorney's fees under 42 U.S.C. § 1988); *United States Football League v. National Football League*, 704 F.Supp. 474 (S.D.N.Y.) (attorney's fees under Clayton Act), *aff'd*, 887 F.2d 408 (2d Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990). Further, Zolt's demands do not mesh with the policy that "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Reliance on *F.H. Krear & Co. v. Nineteen Named Trustees*, 776 F.2d 1563, 1564 (2d Cir.1985) (per curiam), is misplaced. *Krear* is inapt as it dealt with attorney's fees that were a contractually stipulated element of consequential damages, not attorney's fees pursuant to statute. Thus, no basis exists here for a jury trial to determine attorney's fees awarded pursuant to 18 U.S.C. § 1964(c).

■ With respect to amount, plaintiff submitted a detailed accounting of over 500 pages containing time records for the attorneys, summer clerk, and paralegal who worked on this case. The records specified the name of each individual, the date, the amount of time expended, the hourly rate, and a description of the work performed. This information was supported by an affidavit provided by plaintiff's counsel. After reviewing those records, the district court found itself fully satisfied with the detailed documentation and able to determine an appropriate award without any additional discovery or evidentiary hearings. *See Bingham*, 823 F.Supp. at 1137 n. 9.

Steinberg's challenge to the award based on plaintiff's limited success at trial also lacks merit. In *Hensley* the Supreme Court stated, "[t]he result is what matters." *See* 461 U.S. at 435, 103 S.Ct. at 1940. Although plaintiff did not prevail on all of its claims

and the jury did not find all the defendants guilty, the plaintiff obtained a jury verdict and a judgment against defendants. It won the case. We see no abuse of discretion in the award of attorney's fees.

## VI Remaining Issues

■ Zolt makes a number of accusations attempting to show that the trial was conducted in an improper and prejudicial manner. For instance, he declares that plaintiff's counsel was unfairly allowed to ask him leading questions, that he was instructed at times by the trial judge to give yes or no answers, that he was threatened with contempt, that he was questioned by the trial judge in an inappropriate and unfair way, that he was prejudiced by the interruption in his testimony by two days of testimony by Steinberg, who responded to questions by invoking the Fifth Amendment, and that the jury was allowed to infer that Zolt was lying by his failure to remember events.

A careful review of the record shows Zolt's characterization of the trial wholly lacking in merit. It is clear from the trial transcript that Zolt was a hostile witness, making leading questions by plaintiff's counsel entirely proper. *See* Fed.R.Evid. 611(c). He was threatened with contempt, out of the presence of the jury, for constantly responding beyond the questions asked, in order to blame his co-defendants. In a sidebar, the trial judge did note that the jury could infer Zolt was lying. However, in context, it is clear the judge meant that the jury could credit documentary evidence where Zolt claimed not to remember. More importantly, at no time did the judge instruct the jury that a witness's inability to recall constituted evidence of the facts asserted in an attorney's question. All of Zolt's contentions are factually baseless and, further, go to the discretionary conduct of a trial by the district judge. *See Boyle v. Revici*, 961 F.2d 1060, 1064 (2d Cir.1992). We are unable to find any abuse of that discretion and discern no unfairness in the conduct of the trial.

■ Finally, Steinberg urges that RICO's pattern and enterprise requirements are unconstitutionally vague as applied to himself. His assertion relies on Justice Sca-

lia's concurring opinion in *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 251–56, 109 S.Ct. 2893, 2906–09, 106 L.Ed.2d 195 (1989), criticizing the Supreme Court's inability to define RICO's pattern and enterprise requirement. We have consistently held that RICO's pattern and enterprise requirements are not unconstitutionally vague. *See United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir.), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *United States v. Coonan*, 938 F.2d 1553, 1561–62 (2d Cir. 1991), *cert. denied*, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992).

## CONCLUSION

Accordingly, for all the reasons stated, the judgment of the district court is affirmed.